DANIELS ET AL. *v.* BOARD OF ZONING APPEALS OF BALTIMORE COUNTY ET AL.
(Two Appeals in Separate Records)
[Nos. 167-168, October Term, 1953.]

*Decided June 23, 1954.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

Submitted on brief by *John B. Rowe, Harold M. Vick* and *Rowe, Rowe & Vick* for the appellants.

*Charles W. Held, Jr.,* for the Board of Zoning Appeals of Baltimore County.

*Charles B. Bosley* for the intervenors.

HENDERSON, J., delivered the opinion of the Court.

These appeals are from the action of the Circuit Court for Baltimore County affirming orders of the Board of Zoning Appeals declaring that LeRoy Daniels had established a non-conforming use as to the rear portion of lots 23 to 28, inclusive, in Block 6 of Catonsville Manor, but not elsewhere, and that Willard A. Daniels had failed to establish a non-conforming use

in Block 5 of Catonsville Manor. The cases originated before the Zoning Commissioner, apparently on the complaint of neighboring residents, the appellants here appealing from his orders to the Board of Zoning Appeals. The authority of the Zoning Commissioner to conduct hearings and pass the orders is not questioned, under Rule 7 of the regulations adopted pursuant to the provisions of Chapter 502, Acts of 1945 and Title 23, Secs. 366, and 367 of Smith's Code of Public Local Laws of Baltimore County. This rule provides: "In addition to his aforesaid powers the Zoning Commissioner shall have the power, upon notice to the parties in interest, to conduct hearings involving any violation or alleged violation or non-compliance with any zoning regulations, or the proper interpretation thereof, and to pass his order thereon, subject to the right of appeal to the Board of Zoning Appeals as hereinafter provided." The violation for which they were cited was junking and dismantling automobiles in an area zoned residential. They claimed a valid and subsisting non-conforming use.

The appellants contend that the burden of proving the abandonment or discontinuance of a non-conforming use rests upon the protestants, citing *Appeal of Haller Baking Co.*, 295 Pa. 257, 145 A. 77, 79. If that be a correct statement of the law, it would seem to follow that the burden of establishing a non-conforming use in the first instance would rest upon the claimant. We find it unnecessary to pass upon these questions, for here the case was decided, adversely to the claimants at every stage, upon voluminous testimony produced by each side, including a remand to the Board for the taking of additional testimony, and the determinative question is whether there was substantial evidence to support the findings. Cf. *Mayor & C. C. of Balto. v. Shapiro*, 187 Md. 623; *Bensel v. Mayor and City Council of Baltimore*, 203 Md. 506; and *City of Baltimore v. Weinberg*, 204 Md. 257.

Section XI of the Baltimore County Regulations recognizes that "a lawful non-conforming use existing on

the effective date of the adoption of these regulations may continue, provided, however, upon any change from such non-conforming use to a conforming use, or any attempt to change from such non-conforming use to a different non-conforming use or any discontinuance of such non-conforming use for a period of one year, the right to continue to resume such non-conforming use shall terminate; provided, however, that any such lawful non-conforming use may be extended or enlarged to an extent not more than once again the area of the land used in the original non-conforming use." While there was some evidence of abandonment, in the reports by Inspectors of the Zoning Department that they found no physical evidences of an automobile junk yard anywhere on the tract in July, 1947, at a time when LeRoy Daniels, by his own admission, was in jail for a period of seven months, the main stress, in the opinions of both the Board of Zoning Appeals and the trial court, was on the failure of the appellants to show that the use claimed was existing prior to the effective date of the regulations on January 2d, 1945.

LeRoy Daniels testified that the junking business began in 1936, when his father, Willard E. Daniels, moved to Carroll Street, in Block 6, with his four sons. At that time there were few houses in the neighborhood, and no paved streets. The father's house was located on lot 27. LeRoy Daniels testified they used the whole block, which he described at one point as a field, for wrecking cars, although the father only owned lots 23-28, inclusive. In 1941, LeRoy built a house of his own on Queen Anne Street in Block 6, behind his father's house, on two lots he purchased at that time at a tax sale. He testified that the cars junked were "up in the thousands," but he admitted that during the war years they were "down to 10, 12 or 25." The principal business of the family during that period seemed to be private hauling, particularly of building materials. LeRoy was in the army during 1943; in 1945 he purchased at tax sales a number of lots, or groups of lots, in the

neighborhood. Some of these were transferred to his brother, Willard A. Daniels. LeRoy claimed that he had permission from the former owners to use these lots before he purchased them, but could not recall the name of any of these owners. He admitted that he had no written records, and that they never kept books in the business, although he filed tax returns after 1946.

There was testimony from a number of witnesses residing in the neighborhood that there was no junking in the whole area between 1944 and 1947, except for a few cars in the back of Willard E. Daniel's home; that the business did not start on its present scale until 1951.

Willard A. Daniels testified that he had been in the junking business since 1942, and had been using the area of Block 5 for cars "most of it since 1940." At that time he was 17 or 18 years old, and living with his father. He did not own any property at that time, but claimed to have had permission from the owners. He built a house on St. Mary's Street "around 1942 or 1943." St. Mary's Street was not paved until 1947 or 1948. It was shown in cross-examination that he worked as a mechanic at Fort Holabird from October, 1943, until December 14, 1944.

The witness Doub, a farmer in the neighborhood, testified he went to see the Daniels in the spring of 1944 to buy some farm equipment. He saw 2 or 3 pleasure cars, a truck and a farm tractor, in back of Willard E. Daniel's home in Block 6. He tried to purchase the tractor. These were the only vehicles in Block 6, and there was no junk in Block 5 at all. This testimony was corroborated by other witnesses. Mrs. Pruitt, for example, was positive that there was no junking in either block until 1947. She has lived on Carroll Street since 1928. She testified that Willard E. Daniels was in the hauling business, the sons were truck drivers. Occasionally they would dismantle a car. The big expansion of the business was in 1951.

We fully agree with the finding of the trial court that "the Board has not been clearly shown to be wrong",

in finding that a non-conforming use was not established, as of January 2d, 1945, except in the rear of lots 23 to 28, inclusive, of Block 6. It may be noted that the order allows LeRoy Daniels to extend the use, to the extent specified in the regulation, upon his adjoining or contiguous lots. There was substantial evidence to support the contention that on the crucial date, January 2d, 1945, and for a considerable time prior thereto, there was no junking activity anywhere in the neighborhood, except in the rear of the lots mentioned. Even if the testimony of the Daniels is accepted, the use of other lots would seem to have been only casual. In the *Shapiro* case, *supra,* which dealt with the dismantling of automobiles, it was held that activity of this kind on a few occasions, on a vacant lot wholly unadapted for the conduct of a business, did not establish an existing use within the meaning of the city ordinance. Use subsequent to the passage of the county ordinance would only be lawful if it were a continuance of an existing use.

Moreover, there is grave doubt whether the use testified to by the Daniels, prior to their acquisition of the lots at tax sales in 1945 and thereafter, could be considered lawful in any sense. If they were mere squatters, it seems clear that the use was unlawful. Their testimony as to permission given by owners whom they could not name or identify is too vague and indefinite to be entitled to much credence. We cannot find that the Board was clearly wrong in rejecting it, or that its finding was arbitrary or unsupported by substantial evidence.

*Orders affirmed, with costs.*