380 A.2d 741

COMMONWEALTH of Pennsylvania, Appellant,

v.

AIR PRODUCTS AND CHEMICALS, INC., Appellee.

Supreme Court of Pennsylvania.

Argued May 26, 1977.

Decided Dec. 1, 1977.

**320**

Paul S. Roeder, Deputy Atty. Gen., Harrisburg, for appellant.

Samuel C. Harry, Morgan, Lewis & Bockius, Harrisburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

The question in this appeal is whether the "manufacturing exclusion" to the use tax imposed by the Tax Act of 1963 for Education [1] (Tax Act of 1963, or Tax Act) is here applicable to shield from taxation the use of certain equipment by taxpayer-appellee, Air Products and Chemicals, Inc. Answering that question in the affirmative, the Commonwealth Court reversed a decision of the Board of Finance and Review which had sustained a denial of Air Products' claim for a refund of use taxes paid by it between 1967 and 1970. This appeal filed by the Commonwealth of Pennsylvania is from the Commonwealth Court's final order entering judg-

---

[1]. Act of May 29, 1963, P.L. 49, 72 P.S. § 3403–1 *et seq.* This act was repealed by the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 47, *as amended*, 72 P.S. § 7280 (Supp.1977–78), and reenacted in large part by Article II of the later act. *See* 72 P.S. § 7201 *et seq.*

ment in favor of Air Products in the sum of $65,733.03, representing the amount of the refund found due and owing appellant for the years in question. We affirm the judgment.

A summary of the relevant factual background is necessary as a preface to our discussion of the law.[2] Air Products is principally engaged in the making and selling of industrial and medical gases such as oxygen, nitrogen and argon. The manufacturing process is one of compressing and purifying atmospheric air, cooling the air to a temperature sufficiently low so that it will pass to a liquid state, then distilling the liquid air into its constituent liquid elements; as a final step, the liquid oxygen and other elements are conducted through a heat exchanger where they are vaporized into gases.

Marketing the finished gaseous product[3] is accomplished in one of three ways, depending on the usage requirements of the consumer. For customers having the greatest demand, such as steel manufacturers, an entire air separation plant is furnished on-site. To serve customers at the other end of the spectrum, the small or sporadic users, Air Products provides returnable gas cylinders filled at one of its own plants. For sales of intermediate quantities, appellee installs at the buyer's location a complex of equipment termed a "customer station".[4] This appeal relates to Air Products' use of the equipment comprising these customer stations.

A customer station consists of a large insulated vessel designed to hold and maintain the product in its liquid form prior to conversion to gas, and the valves, piping, vaporization apparatus and controls attached to the vessel and in-

2. The facts as recited are taken from a partial stipulation of facts filed by the parties and adopted by the Commonwealth Court, and the supplemental findings made by that court following the *de novo* hearing prescribed by § 1104 of the Fiscal Code, Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. § 1104 (Supp.1977–78).

3. This appeal is not concerned with the taxpayer's liquid product business.

4. Customers for these stations are generally manufacturers and hospitals. Record 3a, par. 7.

volved in transforming the liquid element into its usable gaseous state at the temperature and pressure required for the customer's needs. The liquid conversion system feeds gas directly into the customer's plant and operates automatically whenever the customer draws upon it; it works by a process which is essentially the application of heat to the liquid, the heating medium being either steam, electricity or the ambient air, for at standard temperatures the product will vaporize. Supplied by tank truck deliveries of the liquid, the customer station thus furnishes the buyer a convenient point-of-use source of supply of the finished product, all prior steps in the production process having been accomplished at Air Products' plant.

The Tax Act of 1963 imposes a tax on the use of tangible personal property "purchased at retail",[5] but excludes from its definition of "use" the "use . . . of . . . property . . . directly in any of the operations of—(i) The manufacture of personal property."[6] Whether or not appellee's use of its customer stations constitutes a manufacturing operation within the meaning of the Tax Act is the question for decision.

## I.

The principal contours of the manufacturing exclusion in the use tax have been set forth in two prior decisions of this Court, *Commonwealth v. Sitkin's Junk Co.*, 412 Pa. 132, 194 A.2d 199 (1963), and *Commonwealth v. Olan Mills, Inc. of Ohio*, 456 Pa. 78, 317 A.2d 592 (1974). *Sitkin's Junk* teaches, first, that the excluding provision must be strictly construed against the taxing authority, not the taxpayer, since the statute provides for an exclusion from taxation, not an exemption. 412 Pa. at 141–42, *see also* Statutory Construc-

5. 72 P.S. § 3403–201(b). Air Products constructs the customer stations here considered, but for financing reasons transfers them to leasing companies which in turn lease the stations back to customers, such as appellee. The Act defines "purchase at retail" to include leasing. 72 P.S. § 3403–2(e).

6. 72 P.S. § 3403–2(n)(4)(c)(i).

tion Act of 1972, 1 Pa.C.S.A. § 1928(b)(3). The second proposition made clear by *Sitkin's* is that the word "manufacture" is a defined term in the Tax Act of 1963 [7] and that consequently judicial definitions of manufacture evolved under other statutes are inapposite. The two definitional requirements for a use to come within the exclusion were described in *Sitkin's* thusly:

> "*[F]irst*, the *type* of the activity must fall into one or more categories, i. e., 'manufacturing, fabricating, compounding, processing or other operations' and *second*, as a *result* of one or more types of the prescribed activities, the personal property must be placed 'in a form, composition or character *different* from that in which [such personal property]' was acquired." 412 Pa. at 138, 194 A.2d at 202. (Emphasis in original.)

Once the taxpayer's use of a product is found to satisfy that test, *Olan Mills, supra,* holds, *inter alia,* that it is irrelevant that the activity constitutes but one step of a production process, for the Act excludes from taxation equipment which is used "in any of the operations" of manufacturing. 456 Pa. at 80, 317 A.2d at 593. It is also unimportant, under *Olan Mills,* that the final operation of Air Products' production process takes place at a location which is physically separate from the site of the other stages of the process.

## II.

■■■■■ Air Products' business of separating from the atmosphere and converting into liquid and thence into gas the component elements is, all would concede, manufacturing as defined by the Tax Act.[8] Our initial inquiry, however, is whether that aspect of a customer station which executes

7. The definition contained in the statute is as follows:
   " 'Manufacture.' The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer   .   .   . " 72 P.S. § 3403–2(c).

8. The Commonwealth stipulates that the manufacturing exclusion is applicable to appellee's operations at its home plant and "on-site" plants. Record 3a, par. 5.

the last step of the process—transforming the liquid product to a gas with the proper temperature and pressure—is, standing alone, within the definition. In contending for a negative answer, the Commonwealth points to cases holding that the process of applying heat to or withdrawing it from a product so as to effect a change in state does not constitute manufacturing, inasmuch as a "new article" does not emerge from the process. See *Commonwealth v. American Ice Co.*, 406 Pa. 322, 178 A.2d 768 (1962); *Commonwealth v. Berlo Vending Co.*, 415 Pa. 101, 202 A.2d 94 (1962). Those decisions, however, are applications of the case law definition of manufacturing developed for purposes of the exemption provided by the Capital Stock Tax Act of June 1, 1889, P.L. 420, 72 P.S. § 1871; they are inapposite to the case at bar.[9] *Sitkin's Junk, supra.* Our guide here must be the two-part test peculiar to the Tax Act of 1963, and we have no doubt that it has been met in this case: The type of activity performed at the customer station, i.e., conversion from liquid to gas, even if not "manufacturing, fabricating, compounding, [or] processing," is at least an "operation" within the broad dictionary definition given that word in *Sitkin's Junk, supra*, i.e., "the action of making or producing something." 412 Pa. at 139, 194 A.2d at 203. Similarly, the second part of the test is satisfied since the result of the process which the liquid product undergoes in the customer station is to place it "in a form, composition or character different from that in which it is acquired." 72 P.S. § 3403-2(c).[10]

9. For an illustration of how the same activity may constitute manufacturing for purposes of the use tax but not for another tax, compare *Sitkin's Junk, supra*, and *Commonwealth v. Deitch Co.*, 449 Pa. 88, 295 A.2d 834 (1972) (decided under the Capital Stock Tax Act).

10. The Commonwealth cites two cases from other jurisdictions in arguing for a contrary result: *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 38, 106 A.2d 119 (1954), and *Bay Bottled Gas Co. v. Michigan Dept. of Rev.*, 344 Mich. 326, 74 N.W.2d 37 (1955). In both cases it was held that cylinders designed to vaporize liquefied propane did not qualify for an exemption to the respective state's use tax. Even were we to assume that Air Products' customer stations are functionally equivalent to the propane cylinders involved in the

### III.

We have determined that the taxpayer's use of the equipment comprising a customer station serves a manufacturing purpose because of its conversion of a liquid substance to gas at a certain flow and temperature. This conclusion, however, does not end our inquiry, for the appellant argues that the "basic purpose of the customer station is storage." [11] This argument is based on the fact that one component of the customer station, the insulated tank to which liquid conversion equipment is attached, performs essentially a storage function; this function, it is contended, is the main attribute of the entire complex of equipment called the customer station. In our view the evidence does not sustain this contention.

There is no doubt that one of the uses of tangible personal property which is taxed by the Tax Act of 1963 is storage. 72 P.S. § 3403–2(n)(1). But where a storage facility serves a purpose which is but incident to an operation which constitutes manufacturing within the meaning of the statute, we believe, as does the Commonwealth apparently,[12] that its use must receive the benefit of the exclusion. To

cited cases, we would not consider those decisions to be persuasive authority for purposes of our own tax statute. It suffices to observe that the exemption (not exclusion) which the Maryland statute provides for "manufacturing or compounding" and which the Michigan statute provides for "industrial processing" are more restrictive than the exclusion contained in the Tax Act of 1963 and consequently have been given a narrower reading by the courts of those states.

11. Appellant's brief at 11.

12. Pursuant to the rule-making authority conferred by § 580(a) of the statute, 72 P.S. § 3403–580(a), the Department of Revenue has promulgated Regulation 225. That regulation provides in subsection 2a(2)(a) that "equipment . . . used . . . to . . . store the product from the first production operation to the time the product is packaged for the ultimate consumer . . . [is] considered to be directly used in manufacturing-processing operations." This provision is to be contrasted with subsection 2a(3)(c.9) of the regulation, entitled "Post-Production Activities", which states in pertinent part that "storage facilities . . . used to store the [finished] product are not used directly in manufacturing . . . and are taxable."

conclude otherwise would mean that every piece of a manufacturer's equipment not actually involved in acting upon the raw material would be subject to the tax, a result we think the legislature did not intend.[13]  Thus a facility utilized *solely* to hold an unfinished product in the interim between one phase of the manufacturing cycle and the next is not to be singled out as taxable under the statute before us.  In the case at bar, the tank component of Air Products' customer station appears to perform that function, since it is manifest that appellee's cryogenic products require containment in some sort of properly insulated vessel prior to undergoing conversion to gas.

It is true, as suggested by appellant, that the tank—besides holding the ingredients of the product between stages of the manufacturing process—serves also as a source of convenience for the customer who requires ready access to the product.[14]  This non-manufacturing function of the tank, however, cannot alter the manufacturing nature of the entire customer station complex unless it appears that storage, by itself a taxable use, is the predominant purpose of the customer station equipment.  This "predominant purpose" test is prescribed by the Tax Act of 1963 in any situation where the property being used serves a double purpose, one purpose invoking taxation and the other not:

> "Where tangible personal property or services are utilized for purposes constituting a 'use' as herein defined, and for purposes excluded from the definition of 'use,' the predominant purpose shall determine whether such purposes constitute a 'use,' as herein defined."  72 P.S. § 3403–2(n)(4)(c).[15]

13.  We note that the legislature has designated certain "packaging" equipment as a specific example of property protected by the manufacturing exclusion.  72 P.S. § 3403–2(c)(1).

14.  The taxpayer's expert witness testified on cross-examination that the basic purpose of the storage tank component of the customer station is "[t]o provide a cushion, let's say, between the supply and demand of the product."  R.63a.

15.  Section 201(*o*)(5) of the Tax Reform Code of 1971, 72 P.S. § 7201(*o*)(5), alters the test as follows: "[I]t shall be presumed that

There is nothing in this record which would justify the conclusion that the storage purpose of the storage tank component of the customer station predominates over the clearly manufacturing purpose of the aggregate of apparatus which comprises the liquid conversion system.[16] Since under the Tax Act the non-taxable nature of property used in manufacturing is established by way of a defined legislative *exclusion* from tax, and since the taxpayer's activity here in question fits within that statutory definition, "the use of equipment and supplies in such activity is necessarily excluded from the statutory definition of 'use', [and] the Department of Revenue is without authority to assess a tax on such use." *Commonwealth v. Olan Mills, Inc. of Ohio, supra,* 456 Pa. 78 at 83, 317 A.2d 592 at 595 (1974).[17]

Judgment affirmed.

ROBERTS, J., filed a dissenting opinion in which EAGEN, C. J., joins.

> such property [utilized for both taxable and nontaxable purposes] . . . [is] subject to tax unless the user thereof proves to the department that the predominant purposes for which such property . . . [is] utilized do not constitute a 'sale at retail.' "

16. The stipulation of the parties describes the function of the customer station as follows:

> "The customer station's function is to provide a ready supply of the gas product in a gaseous form at the proper flow rate, at the proper pressure, and at the proper temperature. The liquid gas product as delivered by the tank trailers is unusable by the customer until it has been vaporized." Record 3a, par. 6.

The only portion of the record lending support to the Commonwealth's position is the fact that appellee's standard customer service contract entitled "Bulk Oxygen System Service Agreement," makes one reference to a customer station as a "bulk storage system":

> "Seller shall furnish and install . . . a bulk storage system consisting of storage and control equipment (the "Equipment") to supply Buyer's requirements."

The general specifications which accompany the service contract are entitled "Bulk Gaseous Supply System."

Given all the facts of this case and the strict construction premise of the Tax Act with which we start, the single use of the storage system label in the contract is not sufficient to sustain a conclusion relative to "predominant purpose."

17. The Commonwealth advances an alternative argument for reversal on the theory that, conceding that a customer station performs a

ROBERTS, Justice, dissenting.

The issue presented is whether the bulk storage systems [1] which appellant Air Products & Chemicals, Inc. (Air Products) uses to deliver purified gas serve primarily a storage or a manufacturing function. The majority concludes that the principal function of this equipment is manufacturing, and thus this equipment is not subject to Pennsylvania Use Tax.[2] The evidence demonstrates, however, that these units are primarily for storage rather than manufacture, and hence are taxable. I therefore dissent.

There is a large industrial demand for purified gases such as oxygen, nitrogen and argon. Air Products produces these gases by separating the constituent elements of air and purifying them to the levels required by industry. There

manufacturing operation, the appellee nevertheless cannot claim the benefit of the manufacturing exclusion because (a) the *customer* bears responsibility for supervising the operation of a customer station, and (b) before any manufacturing takes place, title to the product has already passed to the customer as of the moment the liquid is pumped from an Air Products tank truck, a fact demonstrated by the product's being metered for billing purposes from the truck, not the station. Hence, it is argued, if anyone can properly claim the exclusion, it is the Air Products customer, not appellee.

As to point (a), it suffices to note that the equipment operates automatically; the customer does nothing except turn a valve, which is hardly to assume a manufacturing function and responsibility. As to point (b), the metering of the product from taxpayer's tank truck is explained in the stipulation as follows:

"The reason for having the meters on the tank trailers instead of the customer stations is that it is the most economical method of measuring the gas for billing purposes. There is approximately one trailer for every twenty customer stations; therefore, [Air Products] saves the expense of nineteen meters by having it on the trailer." Record 4a, par. 8.

Moreover, it is to be noted that the taxpayer's standard customer contract states that the price per unit of product is the same "whether delivered . . . in liquid form or gaseous form." 34a.

1. "Bulk storage system" is the term which Air Products applies to these units in its customer agreements.

2. The applicable statutory provision is Act of May 24, 1956, P.L. (1955) 1707, § 3, as amended, 72 P.S. § 3403–2(n)(4)(c)(¶4) (1964), now amended and codified in the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 16, § 201, as amended, 72 P.S. § 7201(*o*)(5) (Supp.1977).

are some large industrial customers, such as steel manufacturers, who use so much of these gases that Air Products finds it practical to install on-site plants to carry out this entire production process. The Commonwealth concedes that these plants are equipment engaged in the manufacture of industrial gases. For small customers, Air Products provides bottled gas kept under high pressure in relatively small storage containers, which is released by the customer as needed.

The equipment involved in this case, however, is of a third type, used to supply Air Products' middle-sized customers. These customers use more gas than can safely and economically be delivered in compressed gaseous form but not enough to be able to use full on-site plants economically. Air Products solves this problem by providing these customers with gas, for example oxygen, purified in Air Products' own plants. This oxygen is provided in a liquid state in large storage tanks. Air Products also supplies equipment for warming the liquefied oxygen in order to return it to the gaseous state at a temperature and pressure at which it is useable by the customer.

These bulk storage systems—the tanks holding liquefied oxygen plus the equipment for evaporating the liquid—were developed to store quantities of oxygen too large for storage in ordinary gas bottles. The customers who use these systems find it uneconomical to manufacture purified oxygen from the air on site; therefore they must store purified oxygen at their plants until ready to use it. Assuming that conversion of oxygen from the liquid to the gaseous state is one step of a manufacturing process, it is clear that Air Products and its customers choose to carry out this step at the customer's plant rather than at Air Products' own facilities because this arrangement allows the customer to store more oxygen at its plant than it could economically store if required to obtain gaseous oxygen from Air Products. Thus the equipment is designed primarily to store for use that which has already been produced at Air Products' facilities. The tanks and evaporating equipment to convert liquid

oxygen to gaseous oxygen are provided only because on-site storage of oxygen in its final, gaseous form is impractical. Thus the primary function of this equipment is storage, not manufacturing.

The majority suggests that holding that the primary function of these units is storage

"would mean that every piece of a manufacturer's equipment not actually involved in acting upon the raw material would be subject to [use] tax, a result we think the legislature did not intend." 475 Pa. at 326, 380 A.2d at 744 (footnote omitted).

The majority's fears are unfounded. Where a manufacturing process involves several steps, a manufacturer must often hold intermediate products pending completion of the process. The equipment used to hold the intermediate products will have a storage function, but it will have this function only as part of the manufacturing process in which it is primarily involved. It is there to assist the manufacturer in the process of manufacturing. It is not meant to store inventory for direct use by the customer, as Air Products uses the equipment in this case. If taxation of equipment is analyzed not *in vacuo* but in view of the relevant business and industrial environment, the absurd results the majority fears will be avoided.

It must therefore be concluded that the equipment used by Air Products in its bulk storage systems on customer sites is used primarily for storage and not for manufacturing. I would reverse the judgment of the Commonwealth Court.[3]

EAGEN, C. J., joins in this dissenting opinion.

---

**3.** This case is not controlled by any previous Pennsylvania decision. The result I reach is in accord with decisions from two other jurisdictions with similar but not identical statutes. *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 38, 106 A.2d 119 (1954); *Bay Bottled Gas Co. v. Michigan Dep't of Revenue*, 344 Mich. 326, 74 N.W.2d 37 (1955).