# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

DS Waters of America, Inc.,       :
                 Petitioner    :
                                 :
      v.                       :
                                 :
Commonwealth of Pennsylvania,    :   No. 370 F.R. 2013
              Respondent :   Argued: October 20, 2016

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge

OPINION BY
SENIOR JUDGE PELLEGRINI             FILED: November 30, 2016

      DS Waters of America, Inc. (DS Waters) seeks review of an order of the Board of Finance and Revenue (Board) denying sales and use tax relief for equipment utilized at its two water processing facilities in Pennsylvania for the period of January 1, 2007, through March 31, 2010, because DS Waters failed to qualify for the manufacturing exclusion under the Tax Reform Code of 1971 (Tax Code).[1] For the reasons that follow, we affirm.

## I.

      Section 202 of the Tax Code imposes a tax on "each separate sale at retail of tangible personal property," 72 P.S. § 7202(a), as well as a tax "upon the use

---

[1] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7101-10004.

. . . within this Commonwealth of tangible personal property purchased at retail. . . ." 72 P.S. § 7202(b). However, the Tax Code excludes the *manufacture* of tangible personal property from sales and use tax as such manufacture is specifically excluded from the definitions of both "sale at retail" and "use."[2] The Department of Revenue's (Department) regulations also provide that "[t]he purchase or use of tangible personal property or services performed thereon by a person engaged in the business of manufacturing or processing shall be exempt from tax if such property is predominantly used directly by him in manufacturing or processing operations." 61 Pa. Code § 32.32.

Section 201(c) of the Tax Code specifically defines the term "manufacture" as "[t]he performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer…." 72 P.S. § 7201(c). This provision is applicable to all taxes levied under the Tax Code.

---

[2] *See* Section 201 of the Tax Code, 72 P.S. §§ 7201(k), (o). The definition of "sale at retail" provides, in pertinent part:

> The term "sale at retail" shall not include . . . (ii) such rendition of services or the transfer of tangible personal property including, but not limited to, machinery and equipment and parts therefor and supplies to be used or construed by the purchaser directly in the operations of—
>
> (A) The manufacture of tangible personal property.

72 P.S. § 7201(k)(8)(A). The definition of "use" provides a similar exclusion for the use of tangible personal property, including machinery and equipment. *See* 72 P.S. § 7201(o)(4)(B).

The Department's regulations define the term "manufacturing" as:

> The performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that which it was acquired whether for sale or use by the manufacturer. The change in form, composition or character shall result in a different product having a distinctive name, character and use. Operations such as compounding, fabricating or processing are illustrative of the types of operation which may result in a change although any operation which has that result may be manufacturing. Mere changes in chemical composition or slight changes in physical properties are not sufficient.

61 Pa. Code § 32.1. Notably, the Department's regulatory definition goes on to provide the following example:

> the C Company, as its business operation, takes coffee beans and thereafter, by mechanical and hand labor cleans them, removes the outer skins and roasts the beans. The roasted coffee, resulting from the C Company's activities, is not a manufactured product, notwithstanding the fact that there has been a change in color, weight and size of bean.

*Id.*

As our Supreme Court has noted, the definition of manufacture emphasizes two separate criteria – the type of activity at issue and the result of that activity:

> To constitute 'manufacture,' *first*, the *type* of the activity must fall into one or more categories, i.e. 'manufacturing,

3

> fabricating, compounding, processing or other operations and *second*, as a *result* of one or more types of the prescribed activities, the personal property must be placed 'in a form, composition or character *different* from that in which [such personal property]' was acquired.

*Commonwealth v. Sitkin's Junk Co.*, 194 A.2d 199, 202 (Pa. 1963) (emphasis and alteration in original). The burden is on the taxpayer to prove that the transaction sought to be taxed is either not within the Tax Code or is subject to an exemption. *Id.* at 204. Furthermore, the manufacturing provision at issue here "must be strictly construed against the taxing authority, not the taxpayer, since the statute provides for an exclusion from taxation, not an exemption." *Commonwealth v. Air Products & Chemicals, Inc.*, 380 A.2d 741, 743 (Pa. 1977) (citing *Sitkin's Junk Co.*, 194 A.2d at 204; Statutory Construction Act of 1972, 1 Pa.C.S. § 1928(b)(3)).

Against this backdrop, we turn to the specific facts of this case.

## II.

Suntory Water Group, Inc. (Suntory Water) was a Delaware corporation registered to conduct business in Pennsylvania. It maintained several locations throughout Pennsylvania, including a water processing facility in Carnegie. Suntory Water previously appealed to the Board a Pennsylvania tax assessment for the period of January 1, 1990, through June 30, 1993, asserting that it was entitled to the manufacturing exclusion to the sales and use tax for capital purchases and utilities consumed in its operations. In a decision dated March 1, 1995, the Board concluded that equipment used by Suntory Water to transform source water into purified water and distilled water qualified for the manufacturing exclusion, explaining:

4

Although the resulting _form_ of the finished product is essentially the same as the source product, the composition and character of the finished product is technically very different from that in which it was acquired. Unlike the freezing of ice, which does not constitute manufacturing, the above processing of water results in a permanent chemical change which enables the different uses of the end product. . . . Moreover, the resulting water product, once distilled or made into drinking water, does not eventually "revert" back to its original state (as does ice), but is permanently altered until it is used. Additionally, bottled water, whether it is distilled or otherwise transformed from tap water into drinking water, is federally regulated _as a food product_ by the U.S. Food and Drug Administration (FDA), and must meet specific standards to be labeled as such.

(Exhibit 17 to Stipulation of Facts, at p. 4) (emphasis in original).

In 1998, the Board of Appeals again ruled favorably to Suntory Water. Citing to the Board's 1995 decision, the Board of Appeals held that various steps of Suntory Water's production process qualified as manufacturing, including filling, capping, coding and dating of bottles, as well as loading the bottles onto racks for labeling and distribution.

## III.

Through various mergers, acquisitions, conversions and name changes, Suntory Water is now DS Waters. DS Waters operates water processing facilities in Carnegie and Ephrata, Pennsylvania, in which it takes water from municipalities[3] and

---

[3] Municipal source water is regulated by the Environmental Protection Agency (EPA) and must be kept separate from spring water at all times. Bottled water is regulated by the FDA and must comply with the Federal Food, Drug, and Cosmetic Act as well as federal regulations.

converts it to purified water, and then takes purified water and heats and condenses it to make distilled water (collectively, water products).

To produce purified and distilled water, DS Waters uses stainless steel tanks with various levels of quartz, rocks, media and sand to filter out the turbidity and various particles, suspended material and impurities in the source water. It then softens the source water with filters so that the hardness does not scale up its pipes and machinery. Additional filters are used to remove a variety of chemicals typically present in source water that affect its flavor, including chlorine and chloramines. The source water then goes through a final polishing filter, an ultraviolet sterilizer and the reverse osmosis process. At this point, the source water qualifies as "purified water." To produce distilled water, the source water is further treated through steam distillation to remove any remaining substances, chemicals, metals, bacteria, etc. This involves heating the water until it reaches a gaseous state and then condensing the water vapor back into a liquid form.

Following an audit, the Department issued a sales and use tax assessment to DS Waters for the period of January 1, 2007, through March 31, 2010, in the amount of $412,597.06, including penalties and interest.[4] The Department

[4] The assessment was broken down as follows:

| | |
|---|---|
| State Sales Tax Deficiency: | $83,019.21 |
| Allegheny County Sales Tax Deficiency: | 5,031.66 |
| State Use Tax Capital Deficiency: | 173,868.87 |
| Allegheny County Use Tax Deficiency: | 7,556.18 |
| State Use Tax Expense Deficiency: | 62,838.07 |
| Allegheny Use Tax Expense Deficiency: | 5,050.57 |
| Penalties: | 29,669.23 |

**(Footnote continued on next page…)**

6

determined that DS Waters did not qualify for the manufacturing exclusion and, therefore, assessed a use tax deficiency for certain equipment and supplies purchased and used at both facilities during the audit period, including: plastic bottles and associated freight; bottle racks, tiers, pallets, stackers, destackers and material handling equipment; municipal water equipment, compressors, line reactors, mixers, vent lines, clamps and hoses; and labor charges. Stipulation of Facts, ¶ 8.

DS Waters paid the full amount of the assessment on or about July 6, 2011. It then appealed, and on September 12, 2012, the Board of Appeals revised the audit assessment liability to $332,816.93 plus interest.

DS Waters then appealed to the Board, conceding the State Sales Tax Deficiency and the Allegheny County Sales Tax Deficiency, but continuing to challenge the entire Use Tax Deficiency. By decision dated March 29, 2013, the Board denied the petition for review, concluding that DS Waters failed to demonstrate that its activities in producing purified and distilled water products[5]

---

**(continued…)**

| | |
|---|---|
| Interest: | 45,563.27 |
| Total: | $412,597.06 |

[5] The initial audit determined and the Board agreed that DS Waters' operations of collecting water from springs qualified for the mining exemption to the Tax Code. Pursuant to the Department's regulations, "mining" is defined as:

> Commercial mining both deep and strip mining, quarrying, gas and oil drilling, and other commercial removal of natural resources, minerals or mineral aggregates from the earth or from waste or stock piles or from pits or banks including blast furnace slag. Water well

**(Footnote continued on next page…)**

7

qualified for the manufacturing exclusion pursuant to Section 201(c) of the Tax Code, 72 P.S. § 7201(c). The Board agreed with the Department that DS Waters' operations failed to place the water in a form, composition or character different from that in which the water was acquired, and that the water essentially retained the same identity after going through the various processes at DS Waters' facilities. In addition, the Board held that DS Waters failed to establish that the Department was estopped from assessing tax on the items in question due to the Board's 1995 decision with respect to Suntory Water.

DS Waters then appealed to this Court seeking a refund of $244,766.06 in use tax,[6] as well as a refund of $33,140.01 in interest paid and statutory interest.

---

**(continued…)**

> drillers shall be considered to be engaged in mining and shall be entitled to the mining exemption.

61 Pa. Code § 32.1. The Commonwealth conceded this determination in its brief to this Court and during oral argument. As such, DS Waters' spring water products are not at issue in this appeal.

[6] The specific assessed taxes being appealed are as follows:

| | |
|---|---|
| State Use Tax Capital Deficiency: | $173,868.87 |
| Allegheny County Use Tax Deficiency: | 7,556.18 |
| State Use Tax Expense Deficiency: | 58,903.25 |
| Allegheny Use Tax Expense Deficiency: | 4,437.76 |
| Total: | $244,766.06 |

## IV.

### A.

On appeal,[7] DS Waters first argues that it qualifies for the manufacturing exclusion because the processing and manufacturing of its purified and distilled water products causes a permanent change in the composition and character of the source water. In support of this argument, DS Waters relies primarily on two cases – *Sitkin's Junk Co.* and *Air Products & Chemicals, Inc.*

The taxpayer in *Sitkin's Junk Co.* was engaged in the scrap business wherein it bought mixed and unsorted scrap, removed the unusable and unsalable portions, sorted the remaining scrap, cut the scrap into convenient lengths or baled it, and sold it to steel mills. The mixed, unsorted scrap that the taxpayer started with had little, if any, commercial value; yet after the handling and preparation by the taxpayer, the scrap became a component highly useful in the production of steel. The Supreme Court found that the taxpayer in *Sitkin's Junk Co.* was entitled to the manufacturing exclusion[8] because, as a result of the above process, the scrap was in "a form, composition and character" different from the scrap which it had originally

---

[7] In appeals from decisions of the Board of Finance and Revenue, our review is *de novo* because we function as a trial court even though such cases are heard in our appellate jurisdiction. *Glatfelter Pulpwood Company v. Commonwealth of Pennsylvania*, 19 A.3d 572, 576 n.3 (Pa. Cmwlth. 2011) (*en banc*), *aff'd*, 61 A.3d 993 (Pa. 2013).

[8] The statute at issue in *Sitkin's Junk Co.* was the Selective Sales and Use Tax Act of 1956 (Act of 1956), Act of March 6, 1956, P.L. (1955) 1228, *as amended*, 72 P.S. § 3403-1 – 3403-605, *repealed by* the Act of March 4, 1971, P.L. 6. The definition of manufacture under the Act of 1956 was identical to that currently contained in Section 201(c) of the Tax Code, except the Act of 1956 omitted the word "tangible."

acquired – "that which was useless ha[d] been rendered useful." *Sitkin's Junk Co.*, 194 A.2d at 204.

*Air Products & Chemicals, Inc.* involved a taxpayer engaged in the making and selling of medical and industrial gases such as nitrogen, oxygen and argon. The processes taxpayer utilized to make these gases included compressing and purifying atmospheric air, cooling the air to a point where it would pass to a liquid state, distilling the liquid into its constituent elements, and then vaporizing the elements into separate gases. At issue was the taxpayer's use of equipment at "customer stations" wherein it would install complex equipment at a buyer's location to hold and maintain the products in their liquid form prior to conversion to gas. Again, the Supreme Court held that the taxpayer was entitled to the manufacturing exclusion[9] because "the result of the process which the liquid product undergoes in the customer station is to place it in a form, composition or character different from that in which it is acquired." *Air Products & Chemicals, Inc.*, 380 A.2d at 744 (citation omitted).

DS Waters argues that, similar to these two cases, it takes municipal source water, puts it through various complicated processes to remove impurities, and

---

[9] *Air Products & Chemicals, Inc.* involved the manufacturing exclusion to the use tax imposed by the Tax Act of 1963 for Education, Act of May 29, 1963, P.L. 49, 72 P.S. § 3403-1 – 3403-605. This act was repealed by the Tax Code, and reenacted in large part by Article II of the Tax Code. *See* 72 P.S. § 7201 *et seq*. The Tax Act of 1963 for Education defined the term "manufacture" as "[t]he performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer. . . ." 72 P.S. § 3403-2(c).

transforms it into completely different products. According to DS Waters, if this production merely resulted in a "superficial change" to the source water, the specialized equipment, FDA regulations and strict requirements for chemical composition would all be unnecessary.

However, those cases are not factually similar. The processes involved in sorting, cutting and baling scrap and making industrial gases is not at all similar to the filtration process DS Waters utilizes to "convert" municipal water into purified and distilled water. Further, we note that the Commonwealth in *Air Products & Chemicals, Inc.* conceded that the taxpayer's processes amounted to manufacturing. The issue in that case was when did that particular manufacturing process end, and whether the final step of the process at taxpayer's customer stations involved actual manufacturing or merely storage. Therefore, *Air Products & Chemicals, Inc.* and *Sitkin's Junk Co.* are inapposite and DS Waters' reliance upon them is misplaced.

More analogous is the long line of cases involving the filtration and pasteurization of other products holding that activity did not justify a manufacturing exclusion. For example, in *Stewart Honeybee Products, Inc. v. Commonwealth*, 579 A.2d 872 (Pa. 1990), the taxpayer's business involved "processing raw honey in such a way that it [was] transformed from a crystalline mass into a liquid which has been pasteurized and filtered to remove impurities." *Id.* at 873. The honey was also blended for flavor, heated and cooled to various temperatures to kill bacteria, and packaged in containers of various sizes. The Supreme Court held that the taxpayer was not entitled to the manufacturing exemption because, despite these filtration and pasteurization processes, the basic substance was "not *substantially* changed, and

11

[was] not, therefore, a new, different and useful item." *Id.* at 874 (emphasis in original). Similar results were reached in *Commonwealth v. Tetley Tea Company, Inc.*, 220 A.2d 832, 834 (Pa. 1966) (holding that the procedures involved in processing and packaging loose tea into specially designed bags did not make it a new and different product as "[t]he process starts and ends with tea."); *Rieck-McJunkin Dairy Co. v. School District of Pittsburgh*, 66 A.2d 295 (Pa. 1949), (holding that pasteurization of milk and certain milk products did not qualify as manufacturing); *Commonwealth v. Lowry-Rodgers Co.*, 123 A. 855 (Pa. 1924) (holding that cleaning coffee beans, removing their outer skins and roasting them was not manufacturing); and *Commonwealth v. Glendora Products Co.*, 146 A. 896 (Pa. 1929) (roasting coffee was not manufacturing).

Moreover, *Commonwealth v. Sunbeam Water Co.*, 130 A. 405 (Pa. 1925), dealt with whether the manufacturing exclusion should apply to the production of distilled water. There was no specific definition of the term "manufacture" in 1925 when *Sunbeam* was decided. Rather, the courts generally went by the premise that the Legislature intended the word be taken in its ordinary and general meaning. As for the wording of the Act of July 22, 1913, P.L. 903 regarding the capital stock tax, it exempted from taxation only so much of the capital stock of a corporation "as may be invested in any property or business not strictly incident or appurtenant to its . . . manufacturing business . . . it being the object of this proviso to relieve from State taxation only so much of the capital stock as is invested purely in the . . . manufacturing plant and business."

12

Our Supreme Court in *Sunbeam* rejected the taxpayer's argument that the process of distilling water brought about significant chemical changes in the source of water, and instead held that the process did not result in a change in the form, composition or character of the water. It also said, by way of analogy, that purified water was not manufacturing. As the court explained:

> the boiling and consequent cleaning of water does not make the resulting water a manufacture thereof. It would hardly be contended that, if water were put through a sand or charcoal filter for the purpose of cleansing it of impurities, that this would constitute manufacture of the cleansed water, and we fail to see in essentials how the process used by [taxpayer] is different.

*Id.* at 406.

Even though distilled water is sometimes used differently than purified water does not necessarily mean that distilled water is entitled to the manufacturing exclusion. Ice is used by hospitals to "ice wounds," make ice balls, keep beverages cold, etc. However, in *Marweg v. Commonwealth*, 513 A.2d 525 (Pa. Cmwlth. 1986), we held that the making of ice did not qualify for the manufacturing exclusion to the Tax Code. Moreover, DS Waters is not entitled to the manufacturing exclusion just because there might be a specialized market for some of its distilled water products, including laboratories, food manufacturers, hospitals and medical settings. As noted in the above cases, the focus of the manufacturing determination is not upon the ultimate use of the product, but whether the process utilized by the taxpayer brings about a change in the form, composition or character of the original substance. The fact that the taxpayer's end product may potentially be put to a different use than

13

the original substance is not, in and of itself, dispositive of the issue of manufacturing. If it were, then processing honey from a crystalline mass into a liquid that can be readily consumed by the general public would constitute manufacturing, *see Stewart Honeybee*; filtering and pasteurizing milk into sour cream and condensed milk would constitute manufacturing, *see Rieck-McJunkin*; cleaning, skinning and roasting coffee beans would constitute manufacturing as the beans could now be used to make coffee, *see Lowry-Rodgers* and *Glendora Products*; etc. Moreover, we note that the stipulation of facts in this case fails to contain any information regarding DS Waters' distilled water products, let alone to what "new" uses such products may be put.

It is true that several of the above cases denying application of the manufacturing exclusion involved taxes other than the sales and use tax now contained within the Tax Code. Specifically, *Sunbeam Water Co.* and *Stewart Honeybee* involved the manufacturing exemption to various versions of the capital stock tax. Again, those cases focused on the end product and whether the processes utilized by the taxpayers brought about a change in the form or condition of the basic substance, which is essentially the same definition of manufacture currently found in the Tax Code. In addition, in determining that the filtration of honey did not constitute manufacturing for purposes of the capital stock tax, our Supreme Court looked to its determination in *Ski Roundtop v. Commonwealth*, 553 A.2d 928 (Pa. 1989) for guidance, a case involving the manufacturing exclusion to the use tax in the Tax Code and not the capital stock tax. *See Stewart Honeybee*, 579 A.2d at 872-73. Similarly, *Rieck-McJunkin* involved mercantile taxes and *Tetley Tea* involved the imposition of the franchise tax; however, both cases concentrated on the taxpayers'

14

final products and whether the processes they used created a new and different product. In *Tetley Tea*, the Supreme Court acknowledged that it had previously defined the term "'manufacturing' to be the application of skill and labor to materials so that there results a new, different and useful product," and that "the manufacturing process must have substantially transformed the ingredients in form, quality and use" in order to qualify for the exclusion. *Tetley Tea*, 220 A.2d at 833-34 (citations omitted). Again, this definition of the term manufacture and the crux of these cases are similar to the current manufacturing exclusion found in the Tax Code.

Given all of the above, we find that DS Waters failed to meet its burden of demonstrating that it is entitled to use tax relief based upon the manufacturing exclusion to the Tax Code.

**B.**

DS Waters also argues that because the Board and Board of Appeals both determined that its predecessor, Suntory Water, qualified for the manufacturing exclusion in 1990-1993, the Department is collaterally estopped from assessing use tax on tangible personal property that DS Waters purchased and used to perform water processing activities at its facilities in Carnegie and Ephrata in 2007-2010. According to DS Waters, these previous administrative decisions regarding Suntory Water compel the same result in the current tax appeal. We disagree.

First, we note that DS Waters' estoppel argument relies, in part, upon an unpublished panel decision of this Court, *Corning Asahi Video Products Co. v. Commonwealth*, (Pa. Cmwlth., No. 5 F.R. 2003, filed April 27, 2005). Pursuant to

15

Section 414 of this Court's Internal Operating Procedures, as an unpublished decision, *Corning Asahi* may only be cited for its persuasive value and not as binding precedent. Second, we do not find the estoppel argument to be persuasive in this context. In *Commonwealth v. Western Maryland Rail Road Company*, 105 A.2d 336, 340 (Pa. 1954), our Supreme Court denied the appellant's argument that the Commonwealth was estopped from assessing a tax due to "the failure of officials who, acting under a mistaken impression of the applicable law, either did not impose the taxes or compromised them for lesser amounts than were properly due." In reviewing the extensive case law in this area, the court stated:

> It is a fundamental legal principle that a State or other sovereignty cannot be estopped by any acts or conduct of its officers or agents in the performance of a governmental as distinguished from a proprietary function. No errors or misinformation of officers or agents can estop the government from collecting taxes legally due. However firmly established the rule as to private individuals or corporations that where a person has been induced to act to his detriment by the representations of an agent he can hold the principal on the theory of estoppel, that rule does not apply when a government is the principal. . . . In *Commonwealth v. Taylor's Ex'r*, [] 147 A. 71, 74 [(Pa. 1929)], it was said: 'Defendant's contention is, in effect, that the letter of the auditor general operated to altogether estop the commonwealth. No authority is given for this contention, and we know of none. As a sovereign state we cannot be thus estopped.' . . . In *Commonwealth v. A.M. Byers Co.*, []31 A.2d 530, 532 [(Pa. 1943)], it was said: 'No administrative officer or body, exercising discretion conferred by the legislature, is vested with the power to abrogate the statute law of the Commonwealth, or to grant to individuals an exemption from the general operation of the law. . . . It is well settled that no estoppel can be asserted against the State in the exercise of its taxing power.'

16

*Id.* at 340-41. We hold that the Department was not estopped from assessing a use tax against DS Waters due to a decision of an administrative board issued to a predecessor in interest regarding its operations during a separate tax year. Moreover, we note that our review of the decision of the Board is *de novo*.

Accordingly, the order of the Board is affirmed.

_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

DS Waters of America, Inc.,     :
                    Petitioner   :
                              :
        v.                :
                              :
Commonwealth of Pennsylvania,   :
                    Respondent :  No. 370 F.R. 2013

## **O R D E R**

AND NOW, this 30th day of November, 2016, the order of the Board of Finance and Revenue in the above-captioned matter is affirmed. The parties have 30 days from the entry of this order in which to file exceptions. Pa. R.A.P. 1571(i).

 

_____
DAN PELLEGRINI, Senior Judge